# EXHIBIT  2

DONNA M. MEZIAS (SBN 111902)
AKIN GUMP STRAUSS HAUER & FELD LLP
580 California Street, Suite 1500
San Francisco, CA 94104
Telephone:    415-765-9500
Facsimile:    415-765-9501
dmezias@akingump.com

JOEL M. COHN (admitted pro hac vice)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
Telephone: 202-887-4000
Facsimile: 202-887-4288
jcohn@akingump.com

Attorneys for defendant HOME DEPOT U.S.A.,
INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD SMALLEY, ET AL, | Case No. 3:11-cv-02951-JCS |
| Plaintiffs, | |
| v. | JOINT STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ACCOMPANYING MOTION FOR SUMMARY JUDGMENT FOR PLAINTIFF ALAN A'NEALS |
| HOME DEPOT U.S.A., INC. | |
| Defendant. | Date:   January 4, 2012 |
| | Time:  9:30 a.m. |
| | Place: Courtroom G |
| | Hon. Joseph C. Spero |

Pursuant to Local Rule 56-2 and the Court's Standing Order, defendant Home Depot U.S.A., Inc. submits this Joint Statement of Material Facts Not in Dispute in support of its Motion For Summary Judgment For Plaintiff Alan A'Neals. Home Depot has conferred with plaintiff about this Statement, and plaintiff agrees that the following facts are undisputed. Defendant states as follows:

## I. OVERVIEW OF HOME DEPOT

1.     Home Depot operates large, warehouse-style retail stores that sell a wide range of building materials and home improvement products. *Aquilino v. Home Depot*, *U.S.A., Inc.*, No. 04–04100, 2011 WL 564039, at *2 (D.N.J. Feb. 15, 2011).

2.     Each Home Depot store employs between one to seven Merchandizing Assistant Store Managers ("MASMs"). *Id*.

3.     Home Depot stores contain up to 11 core merchandising departments: Lumber, Building Materials, Flooring, Paint, Hardware, Plumbing, Electrical, Garden, Kitchen & Bath, Millwork, and Decor. *See Novak v. Home Depot U.S.A., Inc.*, 259 F.R.D. 106, 110 (D.N.J. 2009). Merchandising departments are staffed by a varying number of sales associates and one department supervisor. *See* Declaration of Donna Mezias ("Mezias Decl.") ¶ 3, ex. 1, Deposition Transcript of Alan A'Neals ("A'Neals tr.") at 129-30. Each MASM is assigned to manage from one to 11 merchandising departments. *See Novak*, 259 F.R.D. at 110.

4.     The MASM job description provides, in part, that MASMs are responsible for "[m]aintaining department profitability," "provid[ing] leadership to Associates," and "[s]etting store objectives and ensuring they are met," among other responsibilities. Affidavit of Donna Wyatt ("Wyatt Aff.") ¶ 3, ex. 1, Home Depot MASM Job Description, HD000001-02.

## II. A'NEALS' EMPLOYMENT WITH HOME DEPOT

### A.     General Employment History

5.     A'Neals was hired by Home Depot in 1986 as a sales associate. Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals. He was promoted to department supervisor after working for Home Depot for approximately one year. A'Neals tr. at 57-58.

6.     In August 2002, A'Neals was promoted to MASM at store 3312 in Carson City, Nevada. *Id*. at 126-27. In April 2005, he was transferred to store 3311 in Reno, Nevada. *Id*.

7.     As a MASM in the Carson City store, A'Neals normally ran the plumbing,

hardware, and garden departments. *Id*. at 127-28. During various time periods, he also ran the electrical, lumber, paint, and flooring departments. *Id*.

8.    As a MASM in the Reno store, A'Neals ran the plumbing, hardware, garden, and lumber departments. *Id*. at 132. These were the largest departments in the store, with the garden department employing up to 35 associates. *Id*.

9.    In total, the departments to which A'Neals was assigned as an MASM employed up to 61 associates at the Reno store and up to 56 associates at the Carson City store. *Id*. at 132-33; 128-29.

10.    A'Neals was terminated in March 2007. *Id*. at 127.

11.    On January 18, 2007, A'Neals filed a consent to join *Aquilino v. Home Depot, U.S.A. Inc*., No. 04-cv-4100 PGS (D.N.J.). Mezias Decl. ¶ 5, ex. 3, A'Neals Consent to Join *Aquilino v. Home Depot, Inc*.

        **B.    A'Neals' Compensation**

12.    A'Neals highest hourly rate as a department supervisor was $20.00 per hour. A'Neals tr. at 176.

13.    A'Neals' base salary as a MASM ranged from $49,000 to $56,952 per year. *Id*. at 126, 135. He received his salary every two weeks and always received the same amount of salary regardless of how many hours he worked. *Id.* at 135-36. In 2004-2005, A'Neals base salary was $51,500 per year, or $4,291.66 per month. *Id*. at 134-35.

14.    The hourly pay rate for associates at A'Neals' store in 2004-2005 ranged from $7.90 to $16.97 per hour, or $1,369.33 to $2,941.47 per month, based on work weeks of 40 hours. Wyatt Aff. ¶ 4, ex. 2, 2004-2005 Hourly Pay Band, Pay Group C, Market Code 16.

15.    The hourly pay rate for department supervisors at A'Neals' store in 2004-2005 ranged from $11.40 to $21.66 per hour, or $1,976.00 to $3,754.40 per month, based on workweeks of 40 hours. Wyatt Aff. ¶ 4, ex. 2, 2004-2005 Hourly Pay Band, Pay Group G, Market Code 16.

16.    As a MASM, A'Neals was eligible for an annual performance bonus and

stock options. A'Neals tr. at 139. He received bonuses of up to $9,286 per year based on overall store sales and his individual performance. *Id.* at 136-37. A'Neals received 675 stock options in 2003 and 2005. *Id*. at 139-40. As an hourly employee, he was not eligible for either form of compensation. *Id.* at 140, 143.

### C.  A' Neals Performance Evaluations As A MASM

17.    A'Neals' performance evaluation dated December 5, 2003 notes, among other things, that A'Neals "needs to teach, coach and develop DHs in his departments." Mezias Decl. ¶ 6, ex. 4, 2003 Performance and Development Summary of A'Neals. The evaluation also notes, among other things, that A'Neals "must realize that with his position as an ASM he is ultimately responsible for his departments" and "must hold himself along with the [department supervisors] and associates accountable for all actions and situations in his departments." *Id.*

18.    A'Neals' performance evaluation for fiscal year 2005 notes, among other things, his ability to set challenging objectives, communicate expectations, and hold associates accountable for their work performance. A'Neals tr. at 240-41; Mezias Decl. ¶ 7, ex. 5, 2005 Performance and Development Summary of A'Neals. The evaluation praises him for focusing on process and operational consistency to reduce costs and for improving the performance of and articulating a forward-thinking direction for his departments. *Id.* The evaluation notes that he "had strong performance in managing [his] associates." *Id.* A'Neals testified that this was an accurate assessment of his performance as a MASM and that the evaluation highlighted his most important duties as a MASM. A'Neals tr. at 241-42.

### III.   A'NEALS' RESPONSIBILITIES AS A MASM

19.    A'Neals testified that "as an assistant [manager] you were worried about the whole store." *Id*. at 71.

20.    He testified that "[a]s a [assistant] store manager, you're still responsible for the store, no matter what happens in the store." *Id*. at 116.

### A.   Management Of Personnel

4

1.   <u>Supervising and directing</u>

21.   A'Neals testified that "[i]t was [his] job to supervise" employees and that he always supervised many more than two employees. *Id.* at 134, 253-54.

22.   A'Neals gave his department supervisors task lists to be performed "every day." *Id.* at 78. He generated the task lists by walking through the store. *Id.* at 103. The resulting lists could be up to 11 pages long. *Id.* at 103. A'Neals also delegated certain opening and closing procedures to employees on a daily basis. *Id.* at 88-89.

23.   A'Neals held his associates accountable for their performance. *Id.* at 241. In his 2005 self-appraisal, A'Neals noted that "setting the standards for [the] condition of [the] building and operations" took "the store to new heights." Mezias Decl. ¶ 8, ex. 6, 2005 Self-Evaluation of A. A'Neals.

24.   A'Neals testified:

Q. What do you mean "to set the standards for condition of the building and operations"?
A. When I first got there, the store was in a shambles, and it was pretty – looked a wreck. It wasn't really a good shopping experience for the customers. They didn't like the back of the building, didn't like the front of the building. One of my things was to clean it up, which I did. And mine was to set new standards for every assistant manager, because sometimes as assistants we'd have to go back out in the back, and clean the building up out back ourselves instead of the DHs. And he'd send all four of us managers out there to clean it. To me it was like I was tired of cleaning the back of the building, so I was going to set new standards and say these DHs will start doing this instead of us doing it?

Q. Did you – I'm sorry. Go ahead.
A. So we made the DHs, on a weekly basis we started making the DHs go out there and clean it up, and then a lot of things stopped. And that was part of setting new standards for the store to be clean.

Q. Was it within your authority as an assistant store manager to require department supervisors to go out there and perform the maintenance and cleanup?
A. Yes, it was. They're as much responsible as we were to do the job. And it was a lot of their merchandise that was sitting out there from their departments, because they weren't taking care of it. And  then it was part of the operations

5

manager to do some other things partly back there.  But most of it was the DHs not taking care of their merchandise.  And like I said, as assistants we were tired of cleaning up their mess and said you guys need to do this.

A'Neals tr. at 256-57.

25.     A'Neals also held weekly meetings with his staff to set expectations and to assign tasks.  A'Neals tr. at 78, 94.

26.     A'Neals suggested and then developed a new checklist for the Garden department, which was implemented and made it easier to delegate tasks to associates. *Id*. at 81-82.  A'Neals testified that this checklist was used by every store in Reno and maybe even stores outside the district.  *Id*. at 82.

### 2.     Training

27.     A'Neals trained his department supervisors and many new employees.  *Id*. at 93-94, 123; Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals.  He monitored the department supervisors to ensure that they were providing and scheduling training for associates.  A'Neals tr. at 196.

28.     A'Neals testified, "I felt it my obligation to teach . . . the department heads" and "would teach as many people as I could do with my knowledge and skills."  *Id*. at 98.  He trained new employees on merchandising skills, up-selling products, making work lists, reviewing reports, maintaining the store's appearance, keeping products in-stock, and locating products at other stores.  *Id*. at 101-02, 123-26; Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals.

29.     A'Neals taught classes on merchandising, store statistics, and customer service skills.  A'Neals tr. at 100-01.  In the customer service classes, A'Neals taught associates how to sell better and "how to get the whole job done."  *Id*. at 78.  A'Neals testified that store sales and profitability increased "because [he] gave classes."  *Id*. at 101.

### 3.     Hiring

30.     According to Home Depot's Job Description, among the duties of MASMs

6

are interviewing and recommending applicants for hire.  Wyatt Aff. ¶ 3, ex. 1, MASM Job Description, at HD000001.

31.    A'Neals testified as follows:

Q. About how many interviews did you do at the Reno store; if you can recall?
A. I can't recall.

Q. Do you think it was more than 20?
A. It's hard to say.  I did a lot.  I don't remember how many in particular.

Q. Were a good number of people you interviewed -- Strike that.
Of the people that you interviewed, did you make recommendations that some of them be hired based on the scoring and your assessment of their ability during the interview?
A. I would recommend my personal recommendation.  Sometimes I would say I think this guy is a good guy, yes.

Q. Did you recommend that some people not be hired based on your evaluations of them during an interview, and also the criteria you filled out?
A. If it was regarding to promotion of DH, I would say yes, I told them they're not ready to be promoted yet, because I think they would not fail (sic), and I don't think they could handle the responsibility yet.  As far as employees, I would do some interviews, but I never make the decision whether they should be hired or not.  That was up to H.R. to decide that.

Q. But of the interviews that you did, I'm trying to understand when you conducted those interviews, once the interview was over, and you stepped back and realized the individual's ability, experience, character, et cetera, did you sometimes say, you know what, I don't think this guy would be a good employee at Home Depot?
A. If it was an outside source, I could say that, yeah. I can determine -- I could look at him and do that, yes.

Q. When you recommended that somebody not be hired in that circumstance, can you think of anyone who was hired, even though you recommended that they not be hired?
A. No.

Q. Can you think of anyone who was not hired even though you recommended that they be hired?

A. No.

A'Neals tr. at 212-14.

4.  Staffing, scheduling, and discipline

32.   A'Neals had authority to move associates from one department to another and he exercised this authority. *Id.* at 88.

33.   A'Neals testified:

Q. So you have the authority as the assistant store manager running these departments to adjust the schedule to meet whatever priorities there was in the store?
A. That's correct. Mainly with the department heads. With the hourly associates we asked on a volunteer basis if they would want to come in or not.

*Id.* at 62.

34.   When an associate called out sick, A'Neals testified:

Q. So when associates called in, you had to sort of exercise your judgment as the manager to figure out what was the best thing to do under the circumstances?
A. Correct.

*Id.* at 65.

35.   A'Neals was responsible for making sure that his department supervisors and associates worked their scheduled shifts. *Id.* at 61. He also ensured that employees took their breaks at the appropriate times. *Id.* at 152.

36.   A'Neals testified:

Q. Did you have authority to approve overtime?
A. Yes, I did.

Q And did you sometimes approve overtime for associates?
A Yes, I did.

Q. Under what circumstances?
A .They were with a customer, and they were trying to finish up a sale. Say sometimes it was a large sale, a large dollar amount. And I had to give them that overtime to stay with the customer after hours so they could get through with that

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

customer and bring in the dollars.

Q. Did you sometimes deny overtime requests?
A. Yes, I did.

*Id.* at 148-49.

37.   A'Neals testified:

Q. When an employee didn't get permission to work overtime, and they worked overtime anyway, you would discipline them for that?
A. Depending on the circumstances.  If --depending on what it is, and what they got the overtime for.  Sometimes we would take our own discretion and say, you know, okay, try not to let it happen again. It wasn't always a discipline.  But we did talk to them and say, "You have to be careful. You have to watch your time."

Q. Sometimes you disciplined them, and sometimes you didn't?
A. If they had recurrences all the time.  If it was continuing recurrences because we knew they were abusing the system, yes.

*Id.* at 150.

38.   A'Neals sometimes disciplined associates with progressive discipline, which started with a "verbal counseling" session, then moved to written forms for the employee's personnel file.  *Id.* at 151-52.

5.   Evaluating and appraising performance and pay raises

39.   A'Neals prepared performance evaluations of his department supervisors. *Id.* at 184.  In so doing, he was responsible for identifying areas of strength and areas requiring improvement, and developing a game plan to help the department supervisor improve his or her performance.  *Id.* at 185-86.

40.   A'Neals approved the evaluations that his department supervisors prepared of the sales associates or prepared theses evaluations himself.  *Id.* at 184, 191.

41.   A'Neals considered providing associates with feedback and evaluating their performance a very important part of his job, because "if they don't know how they are performing, they can't proceed and do a better job down the road."  *Id.* at 185.

42.   A'Neals testified:

9

Q. So let me make sure I understand the process correctly. As an assistant store manager over your various departments, you would write an evaluation for a department supervisor, and you would give them a rating?
A. Yes.

Q. Once the department supervisor received that rating that you gave them on the form, you would take that form and discuss the rating in a round-table meeting with the other salaried managers in the store?
A. Correct.
Q. At that time the other salaried managers in the store would say, hey, I think the rating should be higher. I think it should be lower. I noticed this. I noticed that about this particular individual's performance.
A. Correct.

Q. And then once that process was over, the salaried management team came to an agreement as to what the rating would be?
A. Right.

Q. And at the end of that round-table meeting, was that the rating that the associate had for that particular –
A. Yes, that was the rating we had. But initially if the store manager felt that he wanted to give extra or wanted to give a little boost, behind closed doors he could do it, after they discussed it.

Q. But the rating that you provided as assistant store manager for the department supervisors served as the basis on which the raise discussion would take place?
A. Yes. That's correct.

Q. So you had significant input, would you agree, with respect to the raises that your department supervisors received?
A. Yes.

*Id.* at 180-81.

### 6. Promotion

43. A'Neals testified that he "promoted over 100 department supervisors." *Id.* at 90; Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals.

44. A'Neals testified:

Q. What did you see in these individuals' performance that led you to promote them?

A. A lot of different traits. A lot of them had some supervisor skills. Some knew how to work, knew a lot about the merchandising and downstocking. They took a whole-store attitude. They weren't there just to come in and leave, they were there to work. And you could see their work ethic on how they worked.

And as you walk them daily, and you got to know them on the floor, you could see the ones that really wanted to go upward or just wanted to be in general. There were some guys that were department head quality, but they didn't want to go upward, and you respected that. But the guys that wanted to really push, if you went out on the floor and saw them, you could see, really see the difference.

\* \* \*

Q. Were you able to distinguish between those associates that you thought were ready and willing to be promoted to the next level and those that were not ready or willing to be promoted to the next level?

A. Yes. I can say that, yes, I was. You could see the difference if they were ready or not.

Q. How did you see the difference?

A. As they progress, their knowledge progressed. And as they ran—they took over some responsibilities in the department for the department head, and you could see them just take it over for the department head. They were doing all the duties, and the department head was basically getting ready to be promoted. Or they would never say no to something, they would always, okay, fine. Let's do it.

A'Neals tr. at 93-95.

45.    A'Neals assisted more than nine individuals get promoted to the assistant store manager position. *Id.* at 98; Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals. He did this by walking with them in the store, encouraging them to try new approaches, and sharing his thoughts with them. *Id.* at 99.

B.    Management Of The Business

1.    Inventory, ordering, and merchandising

46.    A'Neals was responsible for ensuring that his departments were stocked. A'Neals tr. at 248-49; Mezias Decl. ¶ 9, ex. 7, 2003 Self-Evaluation of A. A'Neals.

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

47.     A'Neals developed a sense for the amount of merchandise needed, had certain authority to state that he needed more of some products, and at times ensured that product was ordered.  A'Neals tr. at 113-14.

48.     A'Neals had daily contact with vendors and ensured that his departments had the right supply to meet the customer demand in the store.  *Id*. at 108, 110-11; Mezias Decl. ¶ 4, ex. 2, Resume of Alan A'Neals.  A'Neals' effort allowed him to achieve sales goals.  A'Neals tr. at 111.

49.     Among A'Neals' responsibilities as an MASM was ensuring that product was received in the proper quantities.  A'Neals tr. at 107.

50.     A'Neals testified:

Q. Did you create any other processes or programs?
A. I don't know if you consider it a program, but I implemented merchandising ideas on the garden departments a lot of times in how to set them up correctly.  I had several inputs in the garden.  Table setups at some stores.  Like a couple of stores where I had to tell them I wanted something different, and I made my own Plan-O-Gram up, and then the buyer followed my Plan-O-Gram for that store, and we tried it that year, had some of the best sales.

I did another store where I set up an outside cage, or designed it. And then we based it off of that because of the sheer volume that the store pulled.

Q. And the, I guess plan that you set up for the garden department, was that different from the Plan-O-Gram?
A. On some of the situations it was, just because of the store, the way the store was shaped had some issues with the regular Plan-O-Gram.  Which I had to talk to the buyer and say, hey, this store has a sheer 45 degree where it cuts off half the tables, can we try it this way to see if we can get more room in there?

Q. And because of those circumstances, you were able to make suggestions that had your garden department divert somewhat from the Plan-O-Gram?
A. Yes.

Q. That suggestion that you made was successful because it increased sales?
A. Uh-huh.

---

Q. Can you think of any other programs, processes, ideas or things that you had that affected the store in a major way?

A. I had several ideas that I would always come up with, and how to create sales to the customer, make it more attractive. There was a lot of just little stuff. You know, events and certain things that I would get involved in and design them and just -- and we'd do it. They were all pretty much successful. There was a couple that didn't. But we didn't have enough customers to make the event happen.

But I set up certain events, like some vendors all showing up. I had a vendor event out in front of the store. I was always involved in events and everything in the store. I mean, I was –

Q. Was this true at all of the stores where you worked as an assistant store manager?

A. Yes.

Q. Did you understand yourself to be acting as a manager when you were creating these programs and explaining them to people and implementing them at the store?

A. I would say yes, I did. But it was more as a how can I benefit the customer more, yeah.

A'Neals tr. at 83-85.

### 2. Department profitability

51.    A'Neals testified:

Q. Were you responsible for ensuring that the various departments met their sales goals?

A. I was responsible for making sure that they made a weekly sales goal. And I also made sure that the store was making their weekly sales goal.

*Id*. at 59.

52.    A'Neals testified:

Q. Did you feel like it was your duty as an assistant store manager to look for ways to help save your store money?

A. Yes. I felt very strongly. I was very pro Home Depot.

*Id*. at 80.

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

53.     A'Neals testified:

Q. Did these individuals train you on the overall store budget and overall store profit and loss issues?
A. Yes, they did.

Q. Tell me about that training?
A. That training, well, you took individual reports and went over the individual reports. And sometimes you'd have -- you had some meetings that you would go upstairs, and the district manager would give you classes on some of it. You know, how to make some things better. But I learned a lot as a department head. I had learned a lot of this, how to control and monitor the sales in the departments. And I used a lot of that when I came into assistant to make a lot of my departments profitable. I would self-teach myself a lot of things. If I didn't know it, I would go and read stuff.

*Id*. at 72-73.

54.     A'Neals reviewed various store reports including the profit and loss report, the mark down audit, the daily price change report, the out-of-stock report, labor and productivity reports, and the purchase activity report. *Id*. at 70-73; 167-72. Reviewing and analyzing these store reports helped A'Neals identify trends and monitor sales in his department and the entire store and enabled him to make his departments profitable. *Id*. at 70-71, 73-74. He used the reports to determine how many employees were needed in the store on a seasonal basis and what activities needed to be performed in the store. *Id*. at 71-72, 172-73. He was able to assign tasks and responsibilities based on what he learned through the reports. *Id*. at 174.

55.     A'Neals used his discretion and judgment "all the time" to determine whether to approve a markdown (a discount taken off merchandise.) *Id*. at 147-48. He could discount merchandise up to $500 or $600 and he exercised this authority when a product was damaged or to satisfy a customer. *Id*.

56.     Among A'Neals' responsibilities as an MASM was securing merchandise in the store. *Id*. at 123.

57.     A'Neals testified:

Q. How did you know in a particular department that something needed to be cleaned or signage was inappropriate or was out of stock, et cetera; how did you know that?

A. By walking it every day.

Q. How long would it take you – let me ask you another question first. Which departments would you walk?

A. I would walk – well, if I had three departments, I tried to walk at least two of them that day, and one the next day. Or if I had several departments, then I would try a lot of them on one day, and then the next day. But a lot of times you couldn't get through. Some departments were so bad, you couldn't get through. You did an 11-page list just that one day. And then you had to sit there and try and fix it.

Q. How long -- so it sounds like the time it took you to walk departments would vary on a day-to-day basis?

A. That's right.

Q. It could be as short as how long?

A. Could be as short as a half-hour.

Q. Potentially how long could it take you to walk a department you were responsible for?

A. Two or three, four hours sometimes. If you had a tore-up department, it would take you that long.

\*          \*          \*

Q. Was it managerial responsibility to walk the department and monitor if things were in order?

A. It was the manager's duty, yes, because you had to know your business.

Q. And you were responsible for making sure that once you saw all these problems, that they got corrected?

A. That's correct.

*Id*. at 103-04.

58.     A'Neals also performed shrink walks. *Id*. at 121. Without these walks, his stores would have been less profitable. *Id*. at 122.

59.     A'Neals developed a program to reduce store lighting costs that he

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

suggested to executive management at Home Depot. *Id*. at 79. His lighting idea was implemented "in a lot of the Home Depots." *Id.* Home Depot's CEO personally called A'Neals to thank him for the idea. *Id.*

### 3. Manager on duty responsibilities

60. A'Neals testified that he sometimes worked between 11 and 14 hours per shift for six days a week, and that he was designated as the "manager on duty" several times per week for four to six hours per day. *Id*. at 143, 235.

61. As the designated " manager on duty," in addition to his other MASM duties, A'Neals was responsible for, among other things, answering customer calls for "a manager" (*id*. at 144-45), examining the whole store to ensure it was safe and shopable (*id*. at 156), ensuring compliance with all safety guidelines (*id*. at 157), handling all special service installation and delivery issues (*id*. at 160), managing the front-end (*id*. at 161), ensuring appropriate staffing throughout the store (*id*. at 162), ensuring that displays complied with applicable guidelines (*id*. at 161), and ensuring that all signs for sales items were correct (*id*. at 162).

62. A'Neals testified:

Q. What types of issues would the associates in the store bring to you when you were manager on duty?
A. It could be several issues. I mean, it could be --

Q. For example?
A. Most of the time it was customer-related issues. Could they do a markdown, approve a markdown for the store for goods? It could be a time card issue where they needed overtime, but could they get overtime or not to help finish up with customers? The computer room would call you back to count the money in the back.

Just, I mean, there was just everything that has to do with anything and everything. If there was an issue, it came to you. And it was only for so many hours. You only did that for, say, four to six hours of your shift, then another manager would take over.

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

Q. So when you were manager on duty for those four to six hours, you were responsible for dealing with essentially any issue that came up in the store?
A. That's correct.

Q. And it wasn't just limited to your department?
A. That's correct.

Q. And these issues that you were responsible for dealing with as manager on duty could be raised by associates?
A. Associates, store manager, customers.

Q. Vendors?
A. Vendors. Could be anybody that knew – if they wanted to come in, and they wanted to talk to the manager of the day. Could be security. Could be the fire department. Anybody that came in the store that needed a manager, you were that. For four to six hours you were doing that.

Q. And you had all the authority necessary as manager on duty to appropriately address the issues that were brought to you?
A. That's correct. Unless it was -- there's some employee issues or related issues that regarded an H.R. issue, and then you had to instruct them they had to go to HR for that situation, because it was beyond your means of controlling it.

Q. So there were some unique issues that you referred to H.R.?
A. That's correct. You had to.

*Id*. at 145-47.

63.    A'Neals' stores would not have been able to function profitably, efficiently, and safely if he did not perform his duties as manager on duty. *Id*. at 155.

4.    Opening and closing the store

64.    When A'Neals opened the store, he ensured that the store was safe and the departments were clean, and that there was no freight left over from the night before. *Id*. at 276. He handled any issues that associates reported to him. *Id*. In addition, he would hold a daily store meeting with some employees to discuss stores conditions and sales. *Id*. He was responsible for signing off on an "opening checklist" to confirm that all opening procedures had been followed. *Id*. at 277.

17

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

65.     When he closed the store, A'Neals was responsible for ensuring that all items on the closing checklist were completed. *Id.* at 285-86. He ensured that the store was safe; merchandise was secure; shelves were properly maintained; returned items were back on the shelves; and the tasks on the "packdown list" were completed. *Id.* at 282-85. As A'Neals testified that "[i]t was your responsibility as an assistant [manager] to make sure that the store was secure before you left and went home." *Id.* at 123.

5.     <u>Store safety and legal compliance</u>

66.     A'Neals testified:

Q. Under the first topic on the manager on duty daily checklist it's called Safety?
A. Uh-huh.

Q. The first responsibility is examine the store and shopping environment for potential safety issues. Was that your responsibility as the manager on duty?
A. Yes, it was. It wasn't just -- even though I'm manager of the day, you had to do that all the time.

Q. Did you do that all the time –
A. Yes.

Q. – as a manager?
A. Yes.

Q. And you did it when you were a manager on duty particularly?
A. Yes.

Q. The next one is, "Ensures associates are following proper safety guidelines." Did you do that as manager on duty?
A. Yes. All the time.

Q. Did you do it --
A. I did it as a regular assistant. Because any hazard we can prevent and cost money to Home Depot.

Q. Inspect overheads for safety compliance?
A. Yes.

*Id.* at 156-57.

67. A'Neals had the code for the alarm at the store. *Id*. at 274. One of A'Neals' responsibilities as a MASM was to report if the alarm went off in the store and he was called by the alarm company. *Id*.

68. A'Neals enforced Home Depot policy and various federal and state laws regarding meal periods and rest breaks, time keeping, and operating heavy equipment. *Id*. at 151-52, 106.

## IV. A'NEALS' DIVISION OF WORK TIME

69. A'Neals admitted that he spent 30% of his time performing managerial duties such as supervising associates, delegating tasks, monitoring reports, ensuring that associate worked their scheduled hours, and ensuring that associates complied with the law. *Id*. at 234 .

70. A'Neals testified that he used management skills, including skills that he learned about labor monitoring, budgeting, reviewing the store's profit and loss, and monitoring sales, every day. *Id*. at 75-76.

71. A'Neals spent up to two hours every day reviewing reports. *Id*. at 172.

72. A'Neals spent between 30 and 60 minutes each week meeting with Eugene Littleton, one of his department supervisors, to train him how to review reports and understand Home Depot paperwork. *Id*. at 201-03. A'Neals trained three department supervisors in this manner. *Id*. at 203.

73. A'Neals was expected to be on the sales floor with department supervisors and associates to lead by example. *Id*. at 299. A'Neals was expected "to show the DH what needed to be done by showing them, lead by example by doing what you need to do when running the department and the DH can follow along with you." *Id*. at 300.

74. A'Neals testified:

Q. When you were on the sales floor, were you always observing the work of the individuals you worked with?
A. Always. I probably knew more than the store manager did. We did a lot of—I did a lot on the floor, the employees knew me. And to this day I can walk into

any Home Depot, and they know who I am, and the assistant store manager know who I am and respect me still.

Q. Sometimes when you were, for example, helping a customer or doing another task, were you able to multi-talk and observe associates at the same time?
A. You had to multi-task. You wouldn't survive in Home depot if you didn't.

Q. So that was a key part of your job, multi-tasking?
A. Yes.

Q. Were you were observing the work of these individuals when you were working alongside them? You mentioned maybe take out the trash or downstock things?
A. Sometimes you would be beside them when they would come in. And sometimes, like when I had no DH in hardware, I was working the shelves, and at the same time I could keep an eye on other employees on the other aisles. I would have to stop and go around the corner and look, make sure things were happening, then come back. But you always were—you worked so many hours that you got to know several people on the floor one way or the other.

Q. In working those hours and getting to know their work habits and seeing the skills that they brought to Home Depot, that helped you determine that those individuals were ready to be promoted?
A. Correct. And you had also – but there was reviews, and they had different – you know, whether they follow the work list, whether they did a lot. There's a lot of other factors that you used, all those factors. Whether they can deal with people in the public. Sometimes I would bring them up to customers, how to deal with customers. Because as a DH, sometimes you had to learn how to deal with them. So I would always have them follow me and listen. Lots of them were real surprised at how I dealt with them. But that's how you do it.

Q. You evaluated their ability to perform the functions you just described as well in making your decision to promote?
A. That's correct.

Q. When you were on a sales floor, were you also training these individuals and mentoring them?
A. As much as I could, yeah.

*Id.* at 95-97.

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS

1

2

3

4    Dated:  November 29, 2012            AKIN GUMP STRAUSS HAUER &
                                          FELD LLP
5

6                                         By _____/s/ Donna M. Mezias_____

7                                             Donna M. Mezias
                                              Joel M. Cohn
8                                             Attorneys for defendant
                                              Home Depot U.S.A., Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATEMENT OF MATERIAL FACTS FOR PLAINTIFF ALAN A'NEALS